## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| and | |
| PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL PROTECTION, | |
| Plaintiffs, | |
| v. | Civil Action No. 2:23-cv-867 |
| EASTMAN CHEMICAL RESINS, INC., | |
| Defendant, | |
| and | |
| SYNTHOMER JEFFERSON HILLS LLC, | |
| Fed. R. Civ. P. 19(a) Defendant. | |

## COMPLAINT

The United States of America ("United States"), by authority of the Attorney General of the United States and on behalf of the United States Environmental Protection Agency ("EPA"), and the Pennsylvania Department of Environmental Protection ("PADEP") (collectively, "Plaintiffs"), file this Complaint and allege as follows:

## NATURE OF ACTION

1.     The United States and PADEP bring this civil action against Eastman Chemical Resins, Inc. ("Eastman" or "Defendant") seeking civil penalties and injunctive relief for violations of the Clean Water Act ("CWA"), the Clean Air Act ("CAA"), the Resource Conservation and Recovery Act ("RCRA"), the Pennsylvania Clean Streams Law ("PCSL"), the

Pennsylvania Solid Waste Management Act, ("PSWMA"), and the Pennsylvania Hazardous Waste Management regulations ("PAHWMR").

2.     This action is based on violations that occurred at the facility located at 2200 State Rt. 837 in Jefferson Hills, Allegheny County, Pennsylvania adjacent to the Monongahela River (the "Facility"). The Facility was owned and operated from May 1, 2001 to March 31, 2022 by Eastman. During Eastman's  period of ownership, Eastman manufactured hydrocarbon resins and dispersions at the Facility that are used primarily in hot melt adhesives, rubber and plastic compounding, coatings, sealants, and plastic modification. Among other things, violations at the Facility caused discharges of pollutants into the Monongahela River and an unnamed tributary in amounts greater than allowed by law.

3.     On October 28, 2021, Eastman became a party to a purchase agreement that includes the sale of the Facility, including all assets, to Synthomer Jefferson Hills LLC ("Synthomer" or "Rule 19(a) Defendant"). On March 31, 2022, the Facility asset sale closed. As of April 1, 2022, Synthomer is the owner and operator of the Facility. As the current owner and operator of the Facility, Synthomer is a necessary party under Fed. R. Civ. P. 19(a) and the All Writs Act, 28 U.S.C. § 1651.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter of this action. 28 U.S.C. §§ 1331, 1345, and 1355; 33 U.S.C. §§ 1319(b), 1321(b)(7)(E), and 1321(n) (CWA); 42 U.S.C. § 7413(b) (CAA); and 42 U.S.C. § 6928(a)(1) (RCRA).

5.     Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over PADEP's claims alleged herein because they are so related to the federal claims as to form part of the same case or controversy.

6.      Venue lies in this District pursuant to 28 U.S.C. § 1391(b); 33 U.S.C. §§ 1319(b) and 1321(b)(7)(E) (CWA); 42 U.S.C. § 7413(b) (CAA); and 42 U.S.C. § 6928(a)(1) (RCRA) because Defendant and Synthomer are located and do business in this District and the violations which are the basis for this Complaint occurred in this District.

## NOTICES

7.      As a co-plaintiff in this matter, PADEP has received notice of the commencement of this action pursuant to 33 U.S.C. § 1319(b) (CWA); 42 U.S.C. § 7413(b) (CAA); and 42 U.S.C. § 6928(a)(2) (RCRA).

## AUTHORITY

8.      The United States Department of Justice is authorized to bring this action. 28 U.S.C. §§ 516 and 519; 33 U.S.C. § 1366 (CWA); 42 U.S.C. § 7605 (CAA); 42 U.S.C. § 6928(a) (RCRA).

9.      The Pennsylvania Department of Environmental Protection is authorized to bring this action. 35 P.S. §§ 691.601 and 691.605 and 35 P.S. § 6018.604.

## DEFENDANTS

10.      Defendant Eastman Chemical Resins, Inc. is Delaware corporation with its principal place of business in West Elizabeth, Pennsylvania. It is a wholly owned subsidiary of Eastman Chemical Company.

11.      From May 1, 2001 to March 31, 2022, Defendant owned and operated the Facility at issue in this Complaint.

12.      Synthomer Jefferson Hills LLC is a Delaware limited liability company with its principal place of business in Jefferson Hills, Pennsylvania. It is a subsidiary of Synthomer PLC, a global, publicly held corporation.

13.     On October 28, 2021, Defendant and Eastman Chemical Company became a party to a purchase agreement that included the sale of the Facility, including all assets, to Synthomer. On March 31, 2022, the Facility asset sale closed. As of April 1, 2022, Synthomer is the owner and operator of the Facility. As the current owner and operator of the Facility, Synthomer is a necessary party under Fed. R. Civ. P. 19(a) and the All Writs Act, 28 U.S.C. § 1651.

14.     Defendant Eastman Chemical Resins, Inc. and Synthomer Jefferson Hills LLC are each  a "person" under the CWA, 33 U.S.C. §§ 1321(a)(7), 1362(5); the CAA, 42 U.S.C. § 7602(e); and RCRA, 42 U.S.C. § 6903(15).

15.     Defendant Eastman Chemical Resins, Inc. and Synthomer Jefferson Hills LLC are each a "person" under the PCSL, 35 P.S. § 691.1 and the PSWMA, 35 P.S. § 6018.103.

## STATUTORY AND REGULATORY REQUIREMENTS

### CWA SECTION 301 AND NPDES PROGRAM

16.     The CWA is designed "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA establishes a national goal to eliminate the discharge of pollutants into navigable waters. 33 U.S.C. § 1251(a)(1).

**A.  Prohibition on Discharge of Pollutants**

17.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant by any person, except, *inter alia*, in compliance with a National Pollutant Discharge Elimination System ("NPDES") permit issued by EPA or an authorized state pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

18.     "Discharge of a pollutant" is defined by Section 502(12) of the Clean Water Act,

33 U.S.C. § 1362(12), to mean "any addition of any pollutant to navigable waters from any point

source."

19.     "Pollutant" is defined by Section 502(6) of the Clean Water Act, 33 U.S.C.

§ 1362(6), to include any "dredged spoil, solid waste, incinerator residue, sewerage, garbage,

sewerage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat,

wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and

agricultural waste discharged into water."

20.     "Navigable waters" is defined by Section 502(7) of the Clean Water Act, 33

U.S.C. § 1362(7), to mean "waters of the United States, including the territorial seas."

21.     "Point source" is defined by Section 502(14) of the Clean Water Act, 33 U.S.C.

§ 1362(14), to mean "any discernible, confined and discrete conveyance, including but not

limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock,

concentrated animal feeding operation, or vessel or other floating craft, from which pollutants

are or may be discharged."

**B.  NPDES Program**

22.     Section 402 of the CWA, 33 U.S.C. § 1342, provides authority for EPA to issue

NPDES permits for the discharge of any pollutant, consistent with other provisions of the CWA.

Such permits allow the discharge of pollutants by a permittee into the waters of the United States

subject to the terms and conditions set forth therein.

23.     Section 402(a)(2) of the CWA, 33 U.S.C. § 1342(a)(2), directs EPA to prescribe

conditions for NPDES permits to assure compliance with specified provisions of the CWA. Such

conditions include effluent limitations, sampling requirements, and reporting requirements. 33 U.S.C. §§ 1311, 1318, 1342(a)(2).

24.     Effluent limitations, as defined in Section 502(11) of the CWA, 33 U.S.C. § 1362(11), are restrictions on quantity, rate, and concentration of chemical, physical, biological, and other constituents which are discharged from point sources.

25.     Section 402(b) of the CWA, 33 U.S.C. § 1342(b), provides that a state may establish its own permit program, and after receiving EPA's authorization of its program, may issue NPDES permits within its jurisdiction. EPA retains concurrent enforcement authority pursuant to Section 402(i) of the CWA, 33 U.S.C. § 1342(i).

26.     At all times relevant to this Complaint, the Commonwealth of Pennsylvania has been authorized by EPA to issue NPDES permits within the Commonwealth.

**C.  Enforcement**

27.     Section 309(b) of the CWA, 33 U.S.C. § 1319(b), authorizes EPA to bring a civil action to obtain "appropriate relief, including a permanent or temporary injunction," for violations of Section 301 of the CWA and violations of any condition or limitation in a NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

28.     Section 309(d) of the CWA, 33 U.S.C. § 1319(d), and 40 C.F.R. § 19.4, any person who discharges a pollutant in violation of Section 301(a), 33 U.S.C. § 1311(a), or who violates any condition or limitation contained in a NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, shall be subject to a civil penalty not to exceed $37,500 per day for each violation that occurred after December 6, 2013 through November 2, 2015; and not to exceed $64,618 per day for each violation which takes place after November 2, 2015.

## PCSL STATUTORY AND REGULATORY BACKGROUND

29.     Sections 301 and 307 of the PCSL, 35 P.S. §§ 691.301 and 691.307, prohibit the discharge by any person of any industrial wastes into waters of the Commonwealth of Pennsylvania, except, inter alia, in compliance with a permit issued by PADEP pursuant to Section 307 of the PCSL, 35 P.S. § 691.307, and PADEP's implementing regulations adopted by the Pennsylvania Environmental Quality Board ("EQB"). See 25 Pa. Code Chapters 91, 92a, 93, 95, and 96.

30.     Section 92a.9 of the regulations adopted by the Pennsylvania EQB, 25 Pa. Code § 92.a.9, provides that an NPDES Permit satisfies the permit requirement of Section 307 of the PCSL, 35 P.S. § 691.307.

31.     Under Section 307(c) of the PCSL, a discharge of industrial wastes without a permit or contrary to the terms and conditions of a permit or contrary to PADEP's regulations constitutes a statutory nuisance. 35 P.S. § 691.307(c).

32.     Under Section 3 of the PCSL, a discharge of industrial wastes or any substance into the waters of the Commonwealth, which constitutes or contributes to pollution or creates a danger of pollution is a public nuisance. 35 P.S. § 691.3.

33.     Under Section 1 of the PCSL, "pollution" means the contamination of any waters of the Commonwealth that is likely to render such waters harmful, detrimental or injurious to public health, safety or welfare, or to domestic, municipal, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, fish or other aquatic life, including, but not limited to such contamination by the discharge of any substances into such waters. 35 P.S. § 691.1.

34.     Section 601 of the PCSL, 35 P.S. § 691.601, provides in pertinent part: "Any activity or condition declared by this act to be a nuisance or which is otherwise in violation of this act, shall be abatable in the manner provided by law or equity for the abatement of public nuisances."

35.     Section 611 of the PCSL, 35 P.S. § 691.611, provides in pertinent part:

It shall be unlawful to fail to comply with any rule or regulation of the department or to fail to comply with any order or permit or license of the department, to violate any of the provisions of this act or rules and regulations adopted hereunder, or any order or permit or license of the department, [or] to cause air or water pollution . . . . Any person or municipality engaging in such conduct shall be subject to the provisions of Sections 601, 602 and 605.

36.     Section 605 of the PCSL, 35 P.S. § 691.605,  provides in pertinent part:

In addition to proceeding under any other remedy available at law or equity for a violation of a provision of this act, rule, regulations, order of the department, or a condition of any permit issued pursuant to this act, the department, after hearing, may assess a civil penalty upon a person or municipality for such violation. Such a penalty may be assessed whether or not the violation was willful. The civil penalty so assessed shall not exceed ten thousand dollars ($10,000) per day for each violation.

37.     All dischargers of industrial waste must first obtain a permit from the Department to discharge industrial waste in any manner, directly or indirectly, into waters of the Commonwealth pursuant to Sections 301 and 307, of The Clean Streams Law, 35 P.S. §§ 691.301 and 691.307. Section 92a.1(b) of the Regulations, 25 Pa. Code §92a.1(b), a person may not discharge pollutants from a point source into surface waters except as authorized under an NPDES permit. Section 92a.9 of the Regulations, 25 Pa. Code § 92a.9, a NPDES permit is the discharge permit for purposes of Section 307 of The Clean Streams Law, 35 P.S. § 691.307.

38.     Eastman's failures to comply with the effluent limitations, constitute violations of the NPDES Permit, Sections 301 and 307 of The Clean Streams Law, 35 P.S. §§ 691.301 and 691.307, and Section 92a.1(b) of the Regulations, 25 Pa. Code §92a.1(b); constitute statutory

nuisances under Sections 3 and 307 of The Clean Streams Law, 35 P.S. §§ 691.3 and 691.307;

constitute unlawful conduct under Section 611 of The Clean Streams Law, 35 P.S. § 691.611;

and subject Eastman to civil penalty liability under Section 605 of The Clean Streams Law, 35

P.S. § 691.605.

## CWA SECTION 311(b)(3)

39.     Section 311(b)(3) of the Clean Water Act, 33 U.S.C. § 1321(b)(3), prohibits the

"discharge of oil or hazardous substances … into or upon the navigable waters of the United

States [and] adjoining shorelines … in such quantities as may be harmful as determined by the

President."

40.     Discharges of oil in such quantities as may be harmful to the public health or

welfare or environment of the United States include discharges of oil that "(a) [v]iolate

applicable water quality standards; or (b) [c]ause a film or sheen upon or discoloration of the

surface of the water or adjoining shorelines or cause a sludge or emulsion to be deposited

beneath the surface of the water or upon adjoining shorelines." 40 C.F.R. § 110.3.

41.     "Discharge" is defined by Section 311(a)(2) of the Clean Water Act, 33 U.S.C.

§ 1321(a)(2), to include "any spilling, leaking, pumping, pouring, emitting, emptying, or

dumping."

42.     "Oil" is defined by Section 311(a)(1) of the Clean Water Act, 33 U.S.C.

§ 1321(a)(1), as "oil of any kind or in any form, including, but not limited to, … oil mixed with

wastes."

43.     "Navigable waters" is defined by Section 502(7) of the Clean Water Act, 33

U.S.C. § 1362(7), to mean "waters of the United States, including the territorial seas."

44.     Section 311(b)(7)(A) of the CWA provides that any "person who is the owner, operator, or person in charge of any . . . onshore facility . . . from which oil or a hazardous substance is discharged" in violation of Section 311(b)(3) shall be subject to a civil penalty. 33 U.S.C. § 1321(b)(7)(A).

45.     "Onshore facility" is defined by Section 311(a)(10) of the Clean Water Act, 33 U.S.C. § 1321(a)(10), to include "any facility … of any kind located in, on, or under, any land within the United States other than submerged land."

46.     Pursuant to Section 311(b)(7)(A) of the CWA, 33 U.S.C. § 1321(b)(7)(A), and 40 C.F.R. § 19.4, each violation of Section 311(b)(3) occurring after December 6, 2013 and on or before November 2, 2015 is subject to a civil penalty of up to $37,500 per day of violation or up to $2,100 per barrel of oil discharged, and each violation that occurred after November 2, 2015 is subject to a civil penalty of up to $55,808 per day of violation or up to $2,232 per barrel of oil discharged.

## PADEP REGULATIONS SECTION 95.2(2)(i)

47.     Section 95.2(2)(i) of the regulations adopted by the Pennsylvania EQB provides that "[a]t no time [may oil-bearing wastewaters] cause a film or sheen or discoloration of the waters of this Commonwealth or adjoining shoreline." 25 Pa. Code § 95.2(2)(i).

48.     Section 601(a) of the PCSL, 35 P.S. § 691.601(a), provides in pertinent part: "Any activity or condition declared by this act to be a nuisance or which is otherwise in violation of this act, shall be abatable in the manner provided by law or equity for the abatement of public nuisances."

49.     Section 611 of the PCSL, 35 P.S. § 691.611, provides in pertinent part:

It shall be unlawful to fail to comply with any rule or regulation of the department or to fail to comply with any order or permit or license of the department, to violate any of the

provisions of this act or rules and regulations adopted hereunder, or any order or permit or license of the department, [or] to cause air or water pollution . . . . Any person or municipality engaging in such conduct shall be subject to the provisions of Sections 601, 602 and 605.

50.    Section 605 of the PCSL, 35 P.S. § 691.605, provides in pertinent part:

In addition to proceeding under any other remedy available at law or in equity for a violation of a provision of this act, rule, regulation, order of the department, or a condition of any permit issued pursuant to this act, the department, after hearing, may assess a civil penalty upon a person or municipality for such violation. Such a penalty may be assessed whether or not the violation was willful. The civil penalty so assessed shall not exceed ten thousand dollars ($10,000) per day for each violation.

## CWA SECTION 311(j)

51.    Section 311(j) of the Clean Water Act, 33 U.S.C. § 1321(j), directs the President to promulgate regulations relating to oil spill prevention and response.

52.    The President delegated to the Administrator of EPA the authority to promulgate such regulations under Section 311(j) of the Clean Water Act for discharges from non-transportation-related onshore facilities. Exec. Order No. 11548, Secs. 1(e) & 9, 35 Fed. Reg. 11,677 (July 20, 1970); Exec. Order No. 12777, Sec. 2(d)(1), 56 Fed. Reg. 54,757 (Oct. 18, 1991).

53.    Those regulations, known as the Facility Response Plan ("FRP") and Spill Prevention Control and Countermeasure ("SPCC") regulations, are codified at 40 C.F.R. Part 112.

54.    The term "non-transportation-related onshore facility" for purposes of the FRP and SPCC regulations includes "oil storage facilities including all equipment and appurtenances related thereto." 40 C.F.R. § 112.2 & 40 C.F.R. Part 112 Appendix A, section II(1)(F).

55.    The term "discharge" for purposes of the FRP and SPCC regulations "includes, but is not limited to, any spilling, leaking, pumping, pouring, emitting, emptying, or dumping of oil." 40 C.F.R. § 112.2.

56.     Section 311(b)(7)(C) of the Clean Water Act, 33 U.S.C. § 1321(b)(7)(C), provides that any person who fails or refuses to comply with any regulation issued under subsection (j) shall be subject to a civil penalty.

57.     Pursuant to Section 311(b)(7)(C) of the CWA, 33 U.S.C. § 1321(b)(7)(C), and 40 C.F.R. § 19.4, each violation of a regulation issued under Section 311(j) occurring after November 2, 2015 is subject to a civil penalty of up to $55,808 per day of violation.

**A.  Spill Prevention Control and Countermeasure Regulations**

58.     Section 311(j)(1)(C) of the Clean Water Act, 33 U.S.C. § 1321(j)(1)(C), requires promulgation of regulations to establish procedures and methods for preventing and containing discharges of oil from onshore facilities. Pursuant to 33 U.S.C. § 1321(j)(1)(C), EPA promulgated the Spill Prevention Control and Countermeasures ("SPCC") regulations for non-transportation related onshore facilities, codified at 40 C.F.R. Part 112, Subparts A through C.

59.     The SPCC regulations apply to owners and operators of non-transportation-related onshore facilities engaged in drilling, producing, gathering, storing, processing, refining, transferring, distribution, using, or consuming oil and oil products that, due to their location, could reasonably be expected to discharge oil in quantities that may be harmful into or upon the navigable waters of the United States or adjoining shorelines. 40 C.F.R. § 112.1(b).

60.     The SPCC regulations apply to facilities with an above ground storage capacity greater than 1,320 gallons. 40 C.F.R. § 112.1(d)(2)(ii).

61.     Harmful quantities for purposes of the SPCC regulations are defined as discharges that: (a) violate applicable water quality standards, (b) cause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines, or (c) cause a sludge or

emulsion to be deposited beneath the surface of the water or upon the adjoining shorelines. 40 C.F.R. § 110.3.

62.     To prevent discharges of oil in harmful quantities into navigable waters, 40 C.F.R. Part 112 requires an owner and operator of an onshore facility subject to the SPCC Regulations to prepare in writing and implement an SPCC Plan in accordance with 40 C.F.R. § 112.7 and other applicable sections of 40 C.F.R. Part 112. 40 C.F.R. § 112.3.

### B.  Facility Response Plan Requirements

63.     Section 311(j)(5)(A) of the Clean Water Act, 33 U.S.C. § 1321(j)(5)(A), requires the President to promulgate regulations requiring owners or operators of specified facilities to submit to the President plans for responding to worst case oil discharges and a substantial threat of such discharges. 33 U.S.C. § 1321(j)(5)(A).

64.     Facilities subject to Clean Water Act Section 311(j)(5)(A) requirements include onshore oil facilities that, because of their location, "could reasonably be expected to cause substantial harm to the environment" by discharging oil into or on the navigable waters of the United States or adjoining shorelines ("substantial harm facilities"). 33 U.S.C. § 1321(j)(5)(C)(iv).

65.     Pursuant to Section 311(j)(5)(A), EPA promulgated Facility Response Plan ("FRP") regulations for non-transportation-related substantial harm facilities, codified at 40 C.F.R. §§ 112.20 and 112.21.

66.     A facility is classified as a substantial harm facility if the facility's total oil storage capacity is greater than or equal to 1,000,000 gallons, and the facility is located at a distance (as calculated from the appropriate formula in 40 C.F.R. Part 112, Appendix C) such

that a discharge from the facility could cause injury to fish and wildlife and sensitive

environments. 40 C.F.R. § 112.20(f)(1)(ii)(B).

67.     The FRP regulations require substantial harm facilities to, *inter alia*, develop and

implement a Facility Response Plan detailing the facility's emergency plans for responding to an

oil spill. 40 C.F.R. § 112.20.

68.     The Facility Response Plan must either follow the format contained in 40 C.F.R.

Part 112, Appendix F, or contain the elements described in 40 C.F.R. § 112.20(h)(1)-(11). 40

C.F.R. § 112.20(h).

## PADEP REGULATIONS CHAPTER 91

69.     Section 91.33(a) of the regulations adopted by the Pennsylvania EQB provides

that "it is the responsibility of the person at the time in charge of the substance or owning or in

possession of the premises, facility, vehicle or vessel from or on which the substance is

discharged or placed to immediately notify the Department…" 25 Pa. Code § 91.33(a ).

70.     Section 91.34(a) of the regulations adopted by the Pennsylvania EQB provides

that "Persons engaged in a activity which includes the impoundment, production, processing,

transportation, storage, use, application or disposal of pollutants shall take necessary measures to

prevent the substances from directly or indirectly reaching waters of this Commonwealth,

through accident carelessness, maliciousness, hazard of weather or from another cause." 25 Pa.

Code § 91.34(a).

71.     Section 601(a) of the PCSL, 35 P.S. § 691.601(a), provides in pertinent part:

"Any activity or condition declared by this act to be a nuisance or which is otherwise in violation

of this act, shall be abatable in the manner provided by law or equity for the abatement of public

nuisances."

72.     Section 611 of the PCSL, 35 P.S. § 691.611, provides in pertinent part:

It shall be unlawful to fail to comply with any rule or regulation of the department or to fail to comply with any order or permit or license of the department, to violate any of the provisions of this act or rules and regulations adopted hereunder, or any order or permit or license of the department, [or] to cause air or water pollution . . . . Any person or municipality engaging in such conduct shall be subject to the provisions of Sections 601, 602 and 605.

73.     Section 605(a) of the PCSL, 35 P.S. § 691.605(a), provides in pertinent part:

In addition to proceeding under any other remedy available at law or in equity for a violation of a provision of this act, rule, regulation, order of the department, or a condition of any permit issued pursuant to this act, the department, after hearing, may assess a civil penalty upon a person or municipality for such violation. Such a penalty may be assessed whether or not the violation was willful. The civil penalty so assessed shall not exceed ten thousand dollars ($10,000) per day for each violation.

**CLEAN AIR ACT: RISK MANAGEMENT PROGRAM**

74.     The CAA establishes a framework designed to protect and enhance the quality of the Nation's air so as to promote public health and welfare and the productive capacity of its population. 42 U.S.C. § 7401(b)(1).

75.     Section 112(r)(7) of the CAA, 42 U.S.C. § 7412(r)(7), authorizes EPA to promulgate regulations in order to prevent and minimize the consequences of accidental releases of certain regulated substances.

76.     Pursuant to CAA Section 112(r)(7), 42 U.S.C. § 7412(r)(7), EPA promulgated the Chemical Accident Prevention Provisions at 40 C.F.R. Part 68, also known as the Risk Management Program regulations.

77.     The Risk Management Program regulations apply to the owners and operators of stationary sources that have more than a threshold quantity of a regulated substance in a process. 40 C.F.R. § 68.10(a).

78.     "Owner or operator" is defined as "any person who owns, leases, operates, controls, or supervises a stationary source." 42 U.S.C. § 7411(a)(5).

79.    "Stationary source" is defined to mean any "buildings, structures, equipment, installations or substance emitting stationary activities which belong to the same industrial group, are located on one or more contiguous properties, are under the control of the same person, and from which an accidental release may occur." 42 U.S.C. § 7412(r)(2)(C); 40 C.F.R. § 68.3.

80.    "Accidental release" means an unanticipated emission of a regulated substance or other extremely hazardous substance into the ambient air from a stationary source. 42 U.S.C. § 7412(r)(2)(A); 40 C.F.R. § 68.3.

81.    "Regulated substance" is defined to include a substance listed by EPA under Section 112(r)(3) of the CAA, 42 U.S.C. § 7412(r)(3). 42 U.S.C. § 7412(r)(2)(B). The listed substances are those "which, in the case of an accidental release, are known to cause or may reasonably be anticipated to cause death, injury, or serious adverse effects to human health or the environment." 42 U.S.C. § 7412(r)(3). The list of regulated substances is promulgated at 40 C.F.R. § 68.130.

82.    "Process" is defined to mean "any activity involving a regulated substance include any use, storage, manufacturing, handling, or on-site movement of such substances, or any combination of these activities." 40 C.F.R. § 68.3. "Covered process" means "a process that has a regulated substance present in more than a threshold quantity as determined under [40 C.F.R.] § 68.115." 40 C.F.R. § 68.3

83.    Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes EPA to bring a civil action if EPA finds that any person is in violation of any requirement or prohibition of the Chemical Accident Prevention Provisions.

84.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R.

§ 19.4, each violation of any requirement or prohibition of the Chemical Accident Prevention

Provisions occurring after November 2, 2015 is subject to a civil penalty of up to $117,468 per

day of violation.

### RCRA and PSWMA

85.     RCRA establishes a "cradle-to-grave" program to be administered by EPA and

authorized States for regulating the generation, transportation, and treatment, storage, and

disposal of hazardous waste. 42 U.S.C. §§ 6901–6992k.

86.     RCRA's Subchapter III (42 U.S.C. §§ 6921-6939) (also known as "Subtitle C"),

requires EPA to promulgate regulations establishing performance standards for facilities that

generate, transport, treat, store and/or dispose of hazardous wastes. Together, RCRA Subtitle C

and its implementing regulations, set forth at 40 C.F.R. Parts 260-273, comprise EPA's RCRA

hazardous waste program.

87.     The EPA Administrator may, if certain criteria are met, authorize a state to

operate a hazardous waste program in lieu of the regulations comprising the federal hazardous

waste program. 42 U.S.C. § 6926.

88.     Pursuant to RCRA Section 3006, 42 U.S.C. § 6926, EPA has authorized

Pennsylvania's hazardous waste program, as set forth in the Pennsylvania Hazardous Waste

Management Regulations.

89.     The PSWMA's regulations, by virtue of their authorization by EPA, have become

requirements of Subtitle C of RCRA and are enforceable by EPA in lieu of the analogous federal

regulations, pursuant to Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a) and (g).

90.     The PSWMA's regulations incorporate by reference 40 C.F.R. Parts 260-279 of the 1999 Code of Federal Regulations, with certain exceptions. 25 Pa. Code § 260a.3(e). Accordingly, citations in this Complaint to 40 C.F.R. Parts 260-279 are citations to the 1999 version.

**A.  Permit Requirements and Exceptions**

91.     At all relevant times, Section 3005 of RCRA, 42 U.S.C. § 6925, has prohibited treatment, storage and disposal of hazardous waste except in accordance with a permit. 42 U.S.C. § 6925(a).

92.     25 Pa. Code § 270a.1 incorporates by reference the permit requirements in 40 C.F.R. Part 270, with certain exceptions.

93.     Owners and operators of a facility must obtain a permit for the "treatment," "storage," and "disposal" of any "hazardous waste" identified or listed in 40 C.F.R. Part 261. 25 Pa. Code § 270a.1 (incorporating by reference 40 C.F.R. Part 270); 40 C.F.R. § 270.1(c).

94.     "Facility" is defined to include all contiguous land, and structures, other appurtenances, and improvements on the land, used for treating, storing, or disposing of hazardous waste. 25 Pa. Code § 270a.1 (incorporating by reference 40 C.F.R. Part 270); 40 C.F.R. § 270.2.

95.     "Storage" is defined as "the holding of hazardous waste for a temporary period, at the end of which the hazardous waste is treated, disposed, or stored elsewhere." 25 Pa. Code § 270a.1 (incorporating by reference 40 C.F.R. Part 270); 40 C.F.R. § 270.2.

96.     "Hazardous waste" means a hazardous waste as defined 40 C.F.R. § 261.3. 25 Pa. Code § 270a.1 (incorporating by reference 40 C.F.R. Part 270); 40 C.F.R. § 270.2.

97.     Certain "large quantity generators" of hazardous waste may qualify for an exemption from the permit requirement. 25 Pa. Code§ 262a.10 (incorporating by reference 40 C.F.R. Part 262); 40 C.F.R. § 262.34(a). Under the exemption, a large quantity generator may accumulate hazardous waste on site for ninety days or less without a permit provided the generator complies with certain regulatory requirements, including compliance with specified parts of 40 C.F.R. part 265 (Interim Status Standards). 25 Pa. Code§ 262a.10 (incorporating by reference 40 C.F.R. Part 262); 40 C.F.R. § 262.34(a).

98.     Large quantity generators include owners or operators who generate more than 1,000 kg of non-acute hazardous waste per calendar month. 25 Pa. Code § 262a.10 (incorporating by reference 40 C.F.R. Part 262); 40 C.F.R. § 262.13.

99.     In addition, a generator may accumulate as much as 55 gallons of hazardous waste in containers at or near any point of generation where wastes initially accumulate ("satellite areas") without a permit, and without complying with the requirements identified in 40 C.F.R. § 262.34(a), if it complies with 40 C.F.R. §§ 265.171, 265.172, and 265.173(a) and marks each container with the words "Hazardous Waste" or with other words that identify the contents. 25 Pa. Code§ 262a.10 (incorporating by reference 40 C.F.R. Part 262); 40 C.F.R. § 262.34(c)(1).

**B.  Generator Requirements: Hazardous Waste Determination**

100.    25 Pa. Code § 262a.10 incorporates by reference 40 C.F.R. Part 262, with certain exceptions. 40 C.F.R. Part 262 and its appendices set forth standards applicable to generators of hazardous waste.

101.    40 C.F.R. Part 262 includes the requirement that a person who generates a solid waste must determine if that waste is a hazardous waste listed in Subpart D of 40 C.F.R. part 261. 40 C.F.R. § 262.11; 25 Pa. Code § 262a.10 (incorporating 40 C.F.R. Part 262 by reference).

102.    "Solid waste" is defined to include material that is abandoned, recycled, or considered inherently waste-like, subject to certain exclusions. 40 C.F.R. § 262.11 (referencing definition in 40 C.F.R. § 261.2); 40 C.F.R. § 261.2; 25 Pa. Code § 262a.10 (incorporating 40 C.F.R. Part 262 by reference).

**C.  Standards for Owners and Operators**

103.    25 Pa. Code § 264a.1 incorporates by reference 40 C.F.R. Part 264, with certain exceptions. 40 C.F.R. Part 264 sets forth standards for owners and operators of hazardous waste treatment, storage, and disposal facilities.

104.    40 C.F.R. Part 264 applies to owners and operators of all facilities which treat, store, or dispose of hazardous waste, with certain exceptions. 40 C.F.R. § 264.1(b).

105.    40 C.F.R. Part 264 includes, among other requirements, facility standards (Subpart B); preparedness and prevention requirements (Subpart C); contingency plan and emergency procedures requirements (Subpart D); requirements for use and management of containers (Subpart I); tanks systems requirements (Subpart J); and air emission standards for equipment leaks (Subpart BB).

**D.  Universal Waste Requirements**

106.    25 Pa. Code § 266b.1 incorporates by reference 40 C.F.R. Part 273, with certain exceptions. 40 C.F.R. Part 273 sets standards for universal waste management.

107.    "Universal waste" is defined to include batteries. 25 Pa. Code § 266b.1 (incorporating by reference 40 C.F.R. Part 273); 40 C.F.R. § 273.9.

108.    A small quantity handler of universal waste may accumulate universal waste for no longer than one year from the date the universal waste is generated. 25 Pa. Code § 266b.1 (incorporating by reference 40 C.F.R. Part 273); 40 C.F.R. § 273.15(a).

109.    "Small quantity handler of universal waste" is defined as a universal waste handler who does not accumulate 5,000 kgs or more total of universal waste at any time. 25 Pa. Code § 266b.1 (incorporating by reference 40 C.F.R. Part 273); 40 C.F.R. § 273.9.

110.    "Universal waste handler" is defined to include a generator of universal waste. 25 Pa. Code § 266b.1 (incorporating by reference 40 C.F.R. Part 273); 40 C.F.R. § 273.9.

111.    "Generator" is defined to include any person whose act or process produces hazardous waste identified or listed in 40 C.F.R. Part 261. 25 Pa. Code § 266b.1 (incorporating by reference 40 C.F.R. Part 273); 40 C.F.R. § 273.9.

**E. Enforcement**

112.    Under Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), EPA may bring a civil action for injunctive relief for violations of any requirement of Subtitle C of RCRA or the regulations promulgated thereunder.

113.    Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), and 40 C.F.R. § 19.4 provide that each violation of Subtitle C RCRA or the regulations promulgated thereunder is subject to a civil penalty of up to $87,855 per day of violation occurring after November 2, 2015.

114.    Pursuant to Section 604 of the PSWMA, 35 P.S. § 6018.604, PADEP may bring a civil action for injunctive relief for violations of the PSWMA or its underlying regulations. Pursuant to Section 605 of the PSWMA, 35 P.S. § 6018.605, Defendant is liable for civil penalties in the amount of up to $25,000 per day for each violation of the PSWMA and its implementing regulations.

## GENERAL ALLEGATIONS

**A.  The Facility**

115.    The Facility is a manufacturing facility that produces hydrocarbon resins, intermediates, and co-products from various petroleum streams and chemical monomers. The resins are sold to other manufacturing companies, who further process them into a variety of products, including hot melt adhesives, rubber and plastic compounding, and sealants.

116.    At all times relevant to the Complaint, Defendant owned and operated the Facility.

117.    The Facility has been in operation since approximately 1950. Defendant took ownership from former operator Hercules Chemicals in 2001 and continued ownership through March 31, 2022. As of April 1, 2022, Synthomer is the owner and operator of the Facility.

118.    The Facility consists of numerous manufacturing, storage, and office buildings on approximately 56 acres, bordered on the southwest, northwest, and northeast by paved roadway, and on the southeast by the Monongahela River.

119.    An unnamed tributary to the Monongahela River (the "Unnamed Tributary") flows through the Facility property. It enters the site in the northwest, flows generally southeast through the site and then flows into the Monongahela River.

120.    The Monongahela River is a navigable-in-fact water.

121.    The Unnamed Tributary is a perennial tributary to the Monongahela River.

122.    The Monongahela River is a "navigable water" within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

123.    The Unnamed Tributary is a "navigable water" within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

22

### B.  Facility Processes

124.    The manufacturing processes at the Facility are organized into multiple

processing units.

125.    Raw materials are polymerized at multiple units, including C-5, MP-Poly, and

Water White ("WW") Poly.

126.    Intermediate and finishing process units include Hydrogenation ("Hydro"), WW

Finishing, LTC, C-5 Finishing, and Emulsion.

127.    The Facility also includes multiple laboratories, which are housed at the JTC

building.

128.    Materials used in Facility processes include piperylene, isobutylene, alpha metyl

styrene, styrene, toluene, ammonia, and hydrogen. These materials are delivered to the Facility

by truck, barge, and train.

129.    Prior to use in the processing units, materials are stored at the 837 Tank Farm,

which is comprised of eight feedstock tanks ranging in volume from 500,000 to 1.5 million

gallons.

130.    The Facility also has the capacity to store over 4,000,000 gallons of oil in

approximately 52 above ground storage tanks.

### C.  The Facility's Waste Streams

131.    The Facility generates approximately 2,200 pounds of hazardous waste per

month, which is stored on site before it is shipped offsite to a permitted treatment storage and

disposal facility ("TSDF").

132.    Hazardous wastes generated by the Facility include: hydrocarbon resins and

debris, spent fillers, spent zinc and copper catalysts, solvent/brine with chromium (Waste Code

D001/D007/D018); lab solvent waste (Waste Code U002/U220/F003/F005/D001); COD Vials (Waste Code D002/D009/D011); spent aerosols (Waste code D001); and waste batteries, waste lamps, and waste mercury-containing equipment.

133.    Process wastewater at the Facility is sent to a chemical wastewater pretreatment system. The pretreatment system then discharges to the West Elizabeth publicly owned treatment works.

134.    Stormwater from plant surfaces at the Facility is drained to multiple outfalls that discharge to the Monongahela River and the Unnamed Tributary.

### D.  Enforcement Background

135.    EPA and PADEP conducted an unannounced RCRA Subtitle C Compliance Evaluation Inspection at the Facility on August 30 and 31, 2017 ("2017 RCRA Inspection"). The 2017 RCRA Inspection included a review of the Facility's processes and records to evaluate compliance with RCRA and the PSWMA.

136.    On March 19-21, 2018, EPA and PADEP conducted a CWA inspection at the Facility that focused on compliance with the CWA and Defendant's NPDES Permit ("2018 CWA Inspection"). The 2018 CWA Inspection included observations made during the physical inspection of the Facility and review of documentation related to CWA requirements.

137.    On May 3, 2018, EPA conducted an RMP inspection of the Facility to determine whether Defendant was in compliance with Section 112(r) of the CAA, 42 U.S.C. § 7412(r), and the RMP Regulations (the "2018 RMP Inspection").

138.    On August 14-16, 2018, EPA conducted an unannounced inspection of the Facility (the "2018 Multimedia Inspection"). The 2018 Multimedia Inspection included NPDES, RCRA, SPCC and Air inspectors from EPA, the State of Pennsylvania, and Allegheny County

Health Department ("ACHD"). The inspection focused on specific areas of the facility in order to gain additional information to augment the 2017 RCRA Inspection and the 2018 CWA Inspection.

139.    On May 29, 2019, Defendant entered into an Agreement on Consent ("AOC") with EPA requiring implementation of certain measures to achieve compliance with the RMP regulations. Defendant submitted certification of completion of the work required by the AOC on August 13, 2019.

**FIRST CLAIM FOR RELIEF – CWA and PCSL**
**Unpermitted Discharges of Pollutants**

140.    The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

141.    Based on incident reports submitted by Defendant and EPA observations, Defendant discharged wastewater into waters of the United States from multiple Facility locations on at least 9 occasions between June 2015 and November 2018. See Appendices A and B. These discharges each contained "pollutants," within the meaning of Section 502(6) of the Clean Water Act, 33 U.S.C. § 1362(6).

142.    None of the discharges identified in Appendices A and B were authorized by a Clean Water Act permit.

143.    As further described in Appendices A and B, each of the unauthorized discharges of pollutants was from a "point source" to a "navigable water," within the meaning of Sections 502(7) and (14), 33 U.S.C. § 1362(7) and (14).

144.    Each of the unauthorized discharges identified in Appendices A and B is a violation of Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a), Sections 301 and 307 of

the PCSL, 35 P.S. §§ 691.301 and 691.307, and Section 92a.1(b) of the Regulations, 25 Pa. Code §92a.1(b).

145.    Unless enjoined, the violations are likely to continue.

146.    Pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), and Section 601 and 611 of PCSL, 35 P.S. §§ 691.601 and 611, Defendant is liable for injunctive relief to prevent further discharges in violation of the Clean Water Act.

147.    As the current owner and operator of the Facility, Synthomer is a necessary party under Fed. R. Civ. P. 19(a) and the All Writs Act, 28 U.S.C. § 1651, and is subject to injunctive relief pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), to prevent further discharges from the Facility in violation of the Clean Water Act. Pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), and 40 C.F.R. § 19.4, Defendant is liable for civil penalties of up to $37,500 per day of violation for each unauthorized discharge identified on Appendix A occurring after December 6, 2013 through November 2, 2015; and up to $64,618 per day of violation for each violation occurring after November 2, 2015.

148.    Pursuant to Section 605 of PCSL, 35 P.S. § 691.605., Defendant is liable for civil penalties up to $10,000 per day for each unauthorized discharge.

## SECOND CLAIM FOR RELIEF – CWA and PCSL
### NPDES Permit Violations

149.    The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

150.    At all relevant times, Defendant's operation of the Facility was subject to the requirements of NPDES Permit No. PA0000507 (the "NPDES Permit"), issued under Section 402 of the CWA, 33 U.S.C. § 1342, and Section 307 of the PCSL, 35 P.S. § 691.307.

151.    The NPDES Permit authorizes discharges from the Facility to the Monongahela River and the Unnamed Tributary at specified outfalls subject to certain conditions and limitations, including effluent limitations and monitoring requirements at each outfall location.

152.    Defendant has violated multiple conditions and limitations in NPDES Permit No. PA0000507, as described below.

### Effluent Limit Violations

153.    NPDES Permit No. PA0000507 contains effluent limitations for multiple pollutants, including aluminum, zinc, xylene, and styrene.

154.    Based on Discharge Monitoring Reports submitted by Defendant to PADEP and certified information provided by the Defendant in response to information requests issued by EPA pursuant to Section 308 of the CWA, 33 U.S.C. § 1318, Defendant has exceeded applicable effluent limitations in NPDES Permit No. PA0000507 on over 440 occasions since 2012. See Appendix C.

155.    Each violation of NPDES Permit No. PA0000507 identified in Appendix C is a violation of a condition or limitation in an NPDES permit issued under Section 402 of the CWA, 33 U.S.C. § 1342, and a violation of the NPDES Permit, Sections 301 and 307 of the Clean Streams Law, 35 P.S. §§ 691.301 and 691.307, and Section 92a.1(b) of the Regulations, 25 Pa. Code §92a.1(b).

### Violations of Other Permit Conditions

156.    At all relevant times, Part B, 1.d of the NPDES Permit required the permittee to "at all times maintain in good working order and properly operate and maintain all facilities and systems which are installed or used by the permittee to achieve compliance with the terms and conditions of this permit."

157.    At all relevant times, Part B, 1.d of the NPDES Permit further required that the permittee "develop, install, and maintain Best Management Practices to control or abate the discharge of pollutants when the practices are reasonably necessary to achieve effluent limitations and standards in this permit or to carry out the purposes and intent of the Clean Water Act, or when required to do so by the Department."

158.    At all relevant times, Part B, 1.e of the NPDES Permit required that permittee "shall take all reasonable steps to minimize or prevent any discharge or sludge use or disposal in violation of this permit which has a reasonable likelihood of adversely affecting human health or the environment."

159.    At all relevant times, Part C, 6.B of the NPDES Permit required on-site spills to be "controlled through proper implementation of a PPC [Preparedness, Prevention and Contingency] Plan…"

160.    At all relevant times, Part C, 6.D.1 of the NPDES Permit required the PPC Plan to identify potential sources of pollution that may reasonably be expected to affect the quality of storm water discharges from the Facility and describe the best management practices ("BMPs") used to reduce the pollutants in storm water discharges at the Facility, ensuring compliance with the terms and conditions of this permit.

161.    At all relevant times, Part C, 10 of the NPDES Permit required that within one year of the issuance of the NPDES Permit, Defendant submit a Storm Water Pollution Prevention Plan ("SWPPP") for Outfall Nos. 002, 004, 005, 008, 009, 011 – 017, 019, 020, 023a&b, 024 and 025 (collectively, "Outfalls").

162.    At all relevant times, Part C, 10 of the NPDES Permit required that for each Outfall the SWPPP identify BMPs, housekeeping procedures, and control structures installed and implemented to reduce or eliminate pollutants from the discharges and meet the discharge limits.

163.    At all relevant times, Part C, 10 of the NPDES Permit required that the SWPPP describe all measures implemented by the Defendant to meet the NDPES Permit effluent limitations and/or eliminating or reducing the pollutants discharged.

164.    During the 2018 CWA Inspection, the EPA and PADEP inspection team observed multiple violations of Parts B and C of the NPDES Permit:

    a.  an unidentified residue was leaking from overhead and ground level apparatus at the 837 Tank Farm, in violation of Parts B.1.d., B.1.e., and C.6.B of the NPDES Permit;

    b.  a pump apparatus at the 837 Tank Farm had an apparent leak with signs of residue on machinery and floor of the containment area, in violation of Parts B.1.d., B.1.e., and C.6.B of the NPDES Permit;

    c.  a "t-joint" of the pipe system which conveys stormwater from the 837 Tank Farm to Outfall 020 was disconnected, with water observed dripping from the disconnected pipe and causing erosion in the ground underneath, in violation of Part B, 1.d of the NPDES Permit;

    d.  a portion of the contoured surface of the secondary containment area at the Hydro Unit was flush with the surrounding curbing, creating a potential for material to escape; in violation of Part B, 1.d of the NPDES Permit; and

    e.  residue was apparent outside of the containment area at the Hydro Unit in violation of Parts B.1.d., B.1.e., and C.6.B. of the NPDES Permit.

165.     Each violation of the NPDES Permit described in Paragraph 164 is a violation of a condition or limitation in an NPDES permit issued under Section 402 of the CWA, 33 U.S.C. § 1342, and a violation of the NPDES Permit, Sections 301 and 307 of the PCSL, 35 P.S. §§ 691.301 and 691.307, and Sections 91.34(a) and 92a.1(b) of the Pennsylvania Regulations, 25 Pa. Code §§91.34(a) and 92a.1(b).

**Relief**

166.     Unless enjoined, Defendant's violations are likely to continue.

167.     Pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), and Section 601 and 611 of the PCSL, 35 P.S. §§ 691.601 and 691.611 Defendant is liable for injunctive relief.

168.     As the current owner and operator of the Facility, Synthomer is a necessary party under Fed. R. Civ. P. 19(a) and the All Writs Act, 28 U.S.C. § 1651, and is subject to injunctive relief pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), to prevent further discharges from the Facility in violation of the Clean Water Act.

169.     Pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), and 40 C.F.R. § 19.4, Defendant is liable for civil penalties of up to $37,500 per day of violation for each violation of NPDES Permit No. PA0000507 occurring after December 6, 2013 through November 2, 2015; and up to $64,618 per day of violation for each violation occurring after November 2, 2015.

170.     Pursuant to Section 605 of the PCSL, 35 P.S. § 691.605, Defendant is liable for civil penalties up to $10,000 per day for each violation of NPDES Permit No. PA0000507.

**THIRD CLAIM FOR RELIEF – CWA and PCSL**
**Discharges of Oil in Harmful Quantities**

171.     The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

172.    Defendant is the "owner or operator" of the Facility within the meaning of Section 311(a)(6) of the Clean Water Act, 33 U.S.C. § 1321(a)(6).

173.    The Facility is an "onshore facility," within the meaning of CWA Section 311(a)(10), 33 U.S.C. § 1321(a)(10).

174.    Based on reports submitted by Defendant to PADEP, reports submitted by Defendant to the National Response Center, and EPA and PADEP observations, Defendant has discharged oil into waters of the United States from the Facility on at least four occasions between June 2018 and February 2019. See Appendix B.

175.    The discharges identified in Appendix B, each contained "oil" within the meaning of Section 311(a)(1) of the Clean Water Act, 33 U.S.C. § 1321(a)(1).

176.    As further described in Appendix B, the discharges were each into "navigable waters," within the meaning of Sections 502(7) and 311(b)(3) of the Clean Water Act, 33 U.S.C. §§ 1362(7), 1321(b)(3), which are also "waters of the Commonwealth," within the meaning of Section 1 of the PCSL, 35 P.S. § 691.1.

177.    The discharges identified on Appendix B, each caused a sheen upon the receiving waters, and therefore were in a quantity that "may be harmful" pursuant to 40 C.F.R. § 110.3 and within the meaning of Section 311(b)(3) of the Clean Water Act, 33 U.S.C. § 1321(b)(3).

178.    Each of the discharges identified on Appendix B constitutes a discharge of oil into or upon navigable waters of the United States and adjoining shorelines in harmful quantities, in violation of Section 311(b)(3) of the Clean Water Act, 33 U.S.C. § 1321(b)(3).

179.    Each of the discharges identified in Appendix B caused a sheen of the waters of this Commonwealth or adjoining shoreline in violation of Section 95.2(2)(i) of the Pennsylvania Regulations. 25 Pa. Code § 95.2(2)(i).

180.     Pursuant to Section 311(b)(7)(A) of the Clean Water Act, 33 U.S.C.

§ 1321(b)(7)(A), and 40 C.F.R. § 19.4, Defendant is liable for civil penalties of up to $55,808 per

day of violation or up to $2,232 per barrel of oil discharged for each violation occurring after

November 2, 2015.

181.     Pursuant to Section 605 of the PCSL, 35 P.S. § 691.605, Defendant is liable for

civil penalties up to $10,000 per day for each discharge of oil-bearing wastewaters, which caused

a film, sheen or discoloration of the waters of this Commonwealth or adjoining shoreline.

## FOURTH CLAIM FOR RELIEF – CWA
### SPCC Violations

182.     The allegations of the foregoing Paragraphs are realleged and incorporated herein

by reference.

183.     The Facility is a "non-transportation-related onshore facility" within the meaning

of 40 C.F.R. § 112.2 & 40 C.F.R. Part 112 Appendix A, Section II(1)(F).

184.     The Facility could reasonably be expected to discharge oil in quantities that may

be harmful into or upon the navigable waters of the United States or adjoining shorelines, within

the meaning of 40 C.F.R. § 112.1(b).

185.     The Facility is subject to the SPCC regulations.

186.     Defendant is required to prepare in writing and implement an SPCC Plan for the

Facility. 40 C.F.R. § 112.3.

187.     At the 2018 CWA inspection, EPA reviewed Defendant's SPCC Plan, last revised

in January 2018, and associated discharge prevention and containment procedures. The SPCC

Plan and associated procedures failed to comply with the SPCC regulations in the following

ways:

a.  failed to adequately identify the type of oil and storage capacity for each container by failing to include 275 gallon totes in the SPCC Plan, as required by 40 C.F.R. § 112.7(a)(3)(i);

b.  failed to include procedures for routine handling of products, as required by 40 C.F.R. § 112.7(a)(3)(ii);

c.  contained an inadequate discussion of the potential discharge volumes and direction of flow, by failing to predict direction, rate of low, and total quantity for each equipment type, and failing to include product flow direction if secondary containment fails, as required by 40 C.F.R. § 112.7(b);

d.  failed to provide complete discussions for facility tank car and tank truck loading/unloading rack as required by 40 C.F.R. § 112.7(h), including:

   i.  failed to include capacity of V8 Fire Pond or include a discussion of loading/unloading rack for the 20 Battery Area, as required by 40 C.F.R. § 112.7(h)(1);

   ii.  failed to discuss procedure to prevent premature vehicular departure, as required by 40 C.F.R. § 112.7(h)(2); and

   iii.  failed to include procedure for inspecting lowermost vehicle drains and all outlets for leakage prior to filling and departure, as required by 40 C.F.R. § 112.7(h)(3);

e.  failed to provide complete discussion pertaining to qualification criteria for oil-filled equipment without secondary containment, including reportable discharges in the three years prior to the plan certification, and inspection procedures, as required by 40 C.F.R. § 112.7(k)(1); and

f.   failed to provide complete discussions and/or implement requirements pertaining to bulk storage containers under 40 C.F.R. § 112.8(c), including:

  i.   failed to ensure container material and construction is compatible with stored material and storage conditions, as required by 40 C.F.R. § 112.8(c)(1). Specifically, standing water was observed in the R-1-A dike that could promote corrosion of tank bottom and piping;

  ii.   the 500 Tank Battery Dike failed to contain a poly oil spill on July 3, 2018, indicating failure to provide sufficiently impervious secondary containment for the largest single container in all container installations plus sufficient freeboard to allow for precipitation, as required by 40 C.F.R. § 112.8(c)(2);

  iii.   failed to discuss the frequency and type of integrity testing for each tank implemented to comply with 40 C.F.R. § 112.8(c)(6);

  iv.   failed to identify the tanks with overfill alarms or automatic shutoff valves, or provide the frequency of liquid devices testing implemented to comply with 40 C.F.R. § 112.8(c)(8);

  v.   the floor of 20 Battery Dike was covered with oil material, indicating failure to promptly correct visible oil leaks from containers and remove accumulated oil, as required by 40 C.F.R. § 112.8(c)(10); and

  vi.   a 55-gallon Poly Oil drum at the 500 Tank Battery Area was not positioned to prevent a discharge and containment was not adequately provided, as required by 40 C.F.R. § 112.8(c)(11).

188.   Each deficiency identified in Paragraph 187 is a violation of 40 C.F.R. Part 112.

189.    From at least January 2018 through June 7, 2019, Defendant failed to have an

SPCC Plan for the Facility that met the requirements of the SPCC Regulations.

190.    Pursuant to Section 311(b)(7)(C) of the Clean Water Act, 33 U.S.C.

§ 1321(b)(7)(C), and 40 C.F.R. § 19.4, Defendant is liable for civil penalties of up to $48,762 per

day for each violation of the SPCC regulations.

### FIFTH CLAIM FOR RELIEF – CWA
**FRP Violations**

191.    The allegations of the foregoing Paragraphs are realleged and incorporated herein

by reference.

192.    At all relevant times, the largest tank at the Facility has had a capacity of over

1,500,000 gallons of oil. If not properly contained, a spill from that tank would flow into the

Monongahela River, located directly adjacent to the Facility. Such a discharge could reasonably

be expected to cause a violation of water quality standards and/or a sheen on the Monongahela

River. Uncontained spills or leaks from other oil containers at the Facility could result in similar

impacts.

193.    The Monongahela River is an environmentally sensitive area that contains various

species of fish, and connects with numerous smaller rivers that contain reptile and amphibian

nursery areas.

194.    The Facility is located at a distance such that a discharge of oil from the facility

could cause injury to fish and wildlife and sensitive environments, within the meaning of 40

C.F.R. § 112.20(f)(1)(ii)(B).

195.    Due to its oil storage capacity and location, the Facility could reasonably be

expected to cause substantial harm to the environment, within the meaning of Section

311(j)(5)(C)(iv) of the Clean Water Act, 33 U.S.C. § 1321(j)(5)(C)(iv), by discharging oil into or on navigable waters or adjoining shorelines.

196.    The Facility is subject to the FRP regulations.

197.    Defendant is required to prepare and submit a Facility Response Plan for the Facility that meets the requirements of 40 C.F.R. § 112.20(h) and Appendix F to 40 C.F.R. Part 112. 40 C.F.R. § 112.20.

198.    At the 2018 CWA inspection, EPA reviewed Defendant's FRP, last revised on January 31, 2017. The FRP failed to comply with the FRP regulations in the following ways:

a.    failed to include contact information for the local water supply system, weather report, local television/radio station for evacuation notification, and hospitals for emergency response purposes, as required by 40 C.F.R. § 112.20(h)(3);

b.    failed to adequately discuss hazard evaluation information, as required by 40 C.F.R. § 112.20(h)(4), including vulnerability of fish and wildlife and a discussion of the horizontal range of a potential discharge and tank age as part of the potential oil spill analysis;

c.    failed to adequately discuss discharge scenario information for small, medium, and worst-case discharge scenarios, as required by 40 C.F.R. § 112.20(h)(5);

d.    failed to adequately discuss sump pump capacities, as required by 40 C.F.R. § 112.20(h)(7)(ii);

e.    failed to provide complete information regarding self-inspection, drills/exercises, and response training, as required by 40 C.F.R. § 112.20(h)(8). Specifically, the response equipment list did not include operational status/condition, last test date and frequency of testing, and shelf life; the unannounced component of the

internal exercises had not been implemented; and the FRP did not include logs for

qualified individual notification drills, spill management team tabletop drills,

personnel response training, and discharge preventing meeting; and

    f.    failed to provide complete diagrams, as required by 40 C.F.R. §112.20(h)(9).

Specifically, the Site Plan diagram did not include content and capacities of tanks,

transfer areas, capacity of secondary containment systems, and location of

communication, emergency response, and electrical equipment.

199.    From at least January 31, 2017 through June 7, 2019, Defendant failed to have a

Facility Response Plan that met the Facility Response Plan requirements.

200.    Each deficiency in the FRP is a violation of 40 C.F.R. § 112.20.

201.    Pursuant to Section 311(b)(7)(C) of the Clean Water Act, 33 U.S.C.

§ 1321(b)(7)(C), and 40 C.F.R. § 19.4, Defendant is liable for civil penalties of up to $48,762 per

day for each violation of the FRP regulations.

## SIXTH CLAIM FOR RELIEF - CAA
### Risk Management Program Violations

202.    The allegations of the foregoing Paragraphs are realleged and incorporated herein

by reference.

203.    The Facility uses various chemicals listed under 40 C.F.R. Part 68, including 1,3-

Pentadinene, CAS # 504-60-9 ("Piperylene"); 2-Methylpropene CAS# 115-11-7,

("Isobutylene"); Ammonia (anhydrous), CAS# 7664-41-7 ("Ammonia"); and Hydrogen, CAS

# 1333-74-0 ("Hydrogen").

204.    Piperylene is used as a raw material at the C5 Unit. It is stored as a flammable

liquid at the 837 Tank Farm, then pumped to the C5 Unit for polymerization.

205.    Piperylene is highly flammable.

206.    Isobutylene is also used as a raw material at the C5 Unit. It is stored as a compressed liquefied gas and remains as a pressurized liquid until it is pumped into the C5 reactor, when it flashes to a vapor and is consumed in the polymerization reaction.

207.    Isobutylene is extremely flammable.

208.    Ammonia is used as a neutralizing agent in the C5 Unit. It is stored under pressure on site in liquid form, then piped to the C5 unit through a vaporizer where it becomes a gas.

209.    Ammonia is extremely toxic.

210.    Hydrogen is used as a reactant at the Hydro unit. It is stored as a liquid under cryogenic conditions and then conveyed by pressure as a high-pressure gas to a reactor in the Hydro unit.

211.    Hydrogen is extremely flammable.

212.    Piperylene, Isobutylene, Ammonia, and Hydrogen are each "regulated substances" within the meaning of CAA Section 112(r)(3), 42 U.S.C. § 7412(r)(3) and 40 C.F.R. § 68.3. See 40 C.F.R. § 68.130.

213.    Piperylene, Isobutylene, Ammonia, and Hydrogen each have a threshold quantity of 10,000 pounds. 40 C.F.R. § 68.130, Table 1. The Facility stores Piperylene, Isobutylene, Ammonia, and Hydrogen in amounts that exceed their respective threshold quantities.

214.    The Facility covered processes include the units, tanks, and piping where regulated substances are stored or pumped, such as the C5-Unit and the 837 Tank Farm and connections.

215.    The Facility is a "stationary source" within the meaning of Section 112(r)(2)(C) of the CAA, 42 U.S.C. § 7412(r)(2)(C), and 40 C.F.R. § 68.3.

216.    Defendant is the "owner or operator" of a stationary source within the meaning of 40 C.F.R. § 68.3.

217.    As owner or operator of a stationary source, Defendant must comply with the Risk Management Program requirements set forth at 40 C.F.R. Part 68.

218.    40 C.F.R. § 68.65(d)(2) requires that the owner or operator document that its equipment complies with recognized and generally accepted good engineering practices.

219.    40 C.F.R § 68.48(a)(5) requires that the owner or operator compile and maintain up-to-date safety information relating to equipment, including codes and standards used to design, build, and operate the process.

220.    40 C.F.R § 68.48(b) requires that the owner or operator ensure that the process is designed in compliance with recognized and generally accepted good engineering practices.

221.    At the 2018 RMP Inspection, EPA determined that the piping that carried Piperylene, Isobutylene, Ammonia, and Hydrogen was unlabeled.

222.    Failure to label the piping for regulated substances is contrary to the standards set forth in ASME A13.1-2007 (Scheme for the Identification of Piping Systems), Section 3.1; NFPA 55 (Handling of Compressed Gases and Cryogenic Fluids in Portable and Stationary Containers, Cylinders, and Tanks (2005 ed.)), Section 7.1.3.4; and NFPA 2 (Hydrogen Technologies Code (2016 ed.)), Section 7.1.6.6.

223.    ASME A13.1-2007, NFPA 55 (2005 ed.), and NFPA 2 (2016 ed.) each constitute "recognized and generally accepted good engineering practices" within the meaning of 40 C.F.R. § 68.65(d)(2) and 40 C.F.R. § 68.48(b).

224.    ASME A13.1-2007, NFPA 55 (2005 ed.), and NFPA 2 (2016 ed.) are each applicable standards within the meaning of 40 C.F.R. § 68.48(a)(5).

225.     Defendant's failure to label the piping for its regulated substances and to document such labeling constitutes a violation of 40 C.F.R. § 68.48(b) and 40 C.F.R. § 68.65(d)(2).

226.     Defendant also failed to compile and maintain ASME A13.1-2007, NFPA 55 (2005 ed.), and NFPA 2 (2016 ed.) as up-to-date safety information relating to its piping equipment, in violation of 40 C.F.R § 68.48(a)(5).

227.     After notification of these violations, Defendant certified that it had completed work labeling applicable pipelines on July 12, 2019.

228.     From at least May 3, 2018 through July 12, 2019, Defendant failed to comply with the Risk Management Program requirements set forth at 40 C.F.R. Part 68. Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. § 19.4, Defendant is liable for civil penalties in the amount of up to $117,468 per day for each violation of 40 C.F.R. Part 68.

**SEVENTH CLAIM FOR RELIEF – RCRA and PSWMA**
**Operating Without a Permit**
**25 Pa. Code § 262a.10 & 40 C.F.R. § 270.1**

229.     The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

230.     At all relevant times, Section 3005(a) of RCRA and its implementing regulations prohibited the storage of hazardous waste except in accordance with a permit. 42 U.S.C. § 6925(a); 25 Pa. Code § 270a.1 (incorporating by reference 40 C.F.R. Part 270); 40 C.F.R. § 270.1(b) and (c).

231.     From at least May 1, 2001 until March 31, 2022, Defendant generated and stored hazardous waste at the Facility.

232.     At all relevant times, Defendant generated multiple wastes streams at the Facility, including rags contaminated with trichloroethylene (D040, F002); chloride titration waste (D001, D002, D011, F005), brine-soaked insulation (D007); tank 265 bottoms (D001, D018); alumina dryer drainings (D001); divinylbenzene (D001); Pyridine (D038); methyl methacrylate (D001, U162); spent nickel catalyst (D001); spent Poly oil (D001, D007); lab packs (D001, D003, D006, D009, U188); hydrocarbon solvent/poly filters (D001, D018); carburetor cleaner (D006, D008, D027, D039, D040); spent zinc and copper catalyst (D001); hydrocarbon resin and debris (D001); water calcium chloride with chromium (D007); lab solvents (D001, F003, F005, U002, U220); Tank 78 recovered oil (D001); COD vials (D002, D007, D009, D011); and spent aerosol cans (D001).

233.     The wastes identified in Paragraph 232 each constitute "hazardous waste," within the meaning of 42 U.S.C. § 6903(5), 25 Pa. Code § 270a.1 (incorporating by reference 40 C.F.R. Part 270) and 40 C.F.R. § 270.2.

234.     At all relevant times, Defendant was a "generator" of hazardous waste, within the meaning of 25 Pa. Code § 260a.1 (incorporating by reference 40 C.F.R. Part 260) and 40 C.F.R. § 260.10.

235.     At all relevant times, Defendant was a "large quantity generator" of hazardous waste, within the meaning of 25 Pa. Code § 262a.10 (incorporating by reference 40 C.F.R. Part 262) and 40 C.F.R. § 262.13.

236.     The Facility contains multiple hazardous waste accumulation areas ("HWAA"), including the JTC pad, the C5 pad, and the Hydro HWAA, which accumulate 55-gallon containers and totes of hazardous waste from their respective areas.

237.    The Facility also contains a 15,000-gallon hazardous waste tank (Tank #27), which is fed via a piping system from a 120-gallon hazardous waste tank (Alumina Dryer Tank #1) after the MP Poly process, and a 66-gallon hazardous waste tank (Alumina Dryer Tank #2) after the Water White process.

238.    The Facility also contains approximately 20 satellite accumulation areas for hazardous waste throughout the Facility.

239.    At all relevant times, Defendant engaged in "storage" of hazardous waste at the Facility within the meaning of 42 U.S.C. § 6903(33), 25 Pa. Code § 270a.1 (incorporating by reference 40 C.F.R. Part 270), and 40 C.F.R. § 270.2.

240.    At all relevant times, Defendant was the "owner or operator" of a "facility" that stores hazardous waste, within the meaning of 25 Pa. Code § 270a.1 (incorporating by reference 40 C.F.R. Part 270) and 40 C.F.R. § 270.2.

241.    Defendant was required by 42 U.S.C. § 6925(a), 25 Pa. Code § 270a.1 (incorporating by reference 40 C.F.R. Part 270), and 40 C.F.R. § 270.1 to obtain a permit for storage of hazardous waste at the Facility.

242.    PADEP did not issue any permit to Defendant that authorized storage of hazardous waste.

243.    25 Pa. Code § 262a.10 (incorporating by reference 40 C.F.R. Part 262) and 40 C.F.R. § 262.34(a) (recently recodified at 40 C.F.R § 262.17(a)) set forth a permit exemption which would allow for the accumulation of hazardous waste on site for ninety days or less in containers, tanks, drip pads, or containment buildings without a permit, if the generator meets specific regulatory requirements.

244.     25 Pa. Code § 262a.10 (incorporating by reference 40 C.F.R. Part 262) and 40

C.F.R. § 262.34(c) (recently recodified at 40 C.F.R § 262.15(a)) allow generators to accumulate

up to 55 gallons of hazardous waste in containers near the point of generation if the generator

meets specific regulatory requirements.

245.     At the 2017 RCRA Inspection, EPA and PADEP determined that Defendant

failed to comply with multiple conditions set forth in 40 C.F.R. § 262.34(a) (recently recodified

at 40 C.F.R § 262.17(a)), and therefore does not qualify for the 90-day permit exemption set

forth in 25 Pa. Code § 262a.10 (incorporating by reference 40 C.F.R. Part 262) and 40 C.F.R.

§ 262.34(a) (recently recodified at 40 C.F.R § 262.17(a)):

     a.     Failed to comply with several provisions of 40 C.F.R. Part 265 incorporated by

        reference into 40 C.F.R. § 262.34(a)(1) (recently recodified at 40 C.F.R

        § 262.17(a), which currently incorporates the conditions set forth in Part 262)):

           i.     As further described in Paragraph 278 of this Complaint, failed to keep

               containers of hazardous waste closed, except when necessary to add or

               remove waste, as required by 25 Pa. Code § 262a.10 (incorporating by

               reference 40 C.F.R. Part 262); 40 C.F.R. § 262.17(a)(1)(iv)(A)

               (incorporating applicable requirements of Subpart I of 40 C.F.R. Part 262

               to qualify for permit exemption); and 40 C.F.R. § 262.17(a);

          ii.     As further described in Paragraph 284 of this Complaint, failed to ensure

               that secondary containment associated with Tank #27 was free of gaps as

               required by 25 Pa. Code § 262a.10 (incorporating by reference 40 C.F.R.

               Part 262); 40 C.F.R. § 262.34(a)(1)(ii) (recently recodified at 40 C.F.R

               § 262.17(a)(2)) (incorporating applicable requirements of Subpart J of 40

C.F.R. Part 265 to qualify for permit exemption); and 40 C.F.R.

§ 265.193(e)(1)(iii);

iii. As further described in Paragraphs 286 and 288 of this Complaint, failed to conduct adequate daily inspections of hazardous waste storage tanks as required by 25 Pa. Code§ 262a.10 (incorporating by reference 40 C.F.R. Part 262); 40 C.F.R. § 262.34(a)(1)(ii) (recently recodified at 40 C.F.R § 262.17(a)(2)) (incorporating applicable requirements of Subpart J of 40 C.F.R. Part 265 to qualify for permit exemption); and 40 C.F.R. § 265.195(b);

iv. As further described in Paragraph 294 of this Complaint, failed to mark equipment that contains or contacts hazardous wastes with organic concentrations of at least 10 percent by weight in a manner to distinguish each piece of equipment as required by 25 Pa. Code § 262a.10 (incorporating by reference 40 C.F.R. Part 262); 40 C.F.R. § 262.34(a)(1)(i) & (ii) (recently recodified at 40 C.F.R § 262.17(a)(2)) (incorporating applicable requirements of Subpart BB of 40 C.F.R. Part 265 to qualify for permit exemption); and 40 C.F.R. § 265.1050(c); and

v. As further described in Paragraph 296 of this Complaint, failed to monitor the Tank 265 valve for leaks, as required by 25 Pa. Code § 262a.10 (incorporating by reference 40 C.F.R. Part 262); 40 C.F.R. § 262.34(a)(1)(i) & (ii) (recently recodified at 40 C.F.R § 262.17(a)(2)) (incorporating applicable requirements of Subpart BB of 40 C.F.R. part 265 to qualify for permit exemption); and 40 C.F.R. § 265.1057(a);

b.  Failed to mark Tank 265, a hazardous waste storage tank, with the words "hazardous waste," as required by 25 Pa. Code § 262a.10 (incorporating by reference 40 C.F.R. Part 262) and 40 C.F.R. § 262.34(a)(3) (recently recodified at 40 C.F.R § 262.17(a)); and

c.  Failed to comply with several provisions of 40 C.F.R. Part 265 incorporated by reference into 40 C.F.R. § 262.34(a)(4) (recently recodified at 40 C.F.R § 262.17(a)(7)):

    i.  As further described in Paragraph 253 of this Complaint, failed to maintain adequate job descriptions at the Facility for personnel with hazardous waste management responsibilities, as required by 25 Pa. Code§ 262a.10 (incorporating by reference 40 C.F.R. Part 262); 40 C.F.R. § 262.34 (a)(4) (recently recodified at 40 C.F.R § 262.17(a)(7)(iv)) (requiring compliance with 40 C.F.R. § 265.16(d)(2) to qualify for permit exemption); and

    ii.  As further described in Paragraphs 269-270 of this Complaint, failed to designate a primary emergency coordinator in the facility's contingency plan when multiple emergency coordinators are listed as required by 25 Pa. Code§ 262a.10 (incorporating by reference 40 C.F.R. Part 262); 40 C.F.R. § 262.34(a)(4) (recently recodified at 40 C.F.R § 262.17(a)(6) and 262.261(d); and 40 C.F.R. § 265.52(d).

246.  At the 2017 RCRA Inspection, EPA and PADEP determined that Defendant failed to comply with requirements set forth in 40 C.F.R. § 262.34(c) (recently recodified at 40 C.F.R § 262.15), and therefore does not qualify for the satellite area exemption set forth in 25 Pa.

Code § 262a.10 (incorporating by reference 40 C.F.R. Part 262) and 40 C.F.R. § 262.34(c) (recently recodified at 40 C.F.R § 262.15). Defendant failed to mark a partially full 55-gallon satellite accumulation container of waste material in the LTC area with the words "hazardous waste" or with other words that identify the contents, as required by as required by 25 Pa. Code § 262a.10 (incorporating by reference 40 C.F.R. Part 262) and 40 C.F.R. § 262.34(c)(1)(ii) (recently recodified at 40 C.F.R § 262.15(a)(5)).

247.    Upon information and belief, from at least August 31, 2017 through March 31, 2022, Defendant violated 42 U.S.C. § 6925(a) and 25 Pa. Code § 270a.1, which incorporates by reference 40 C.F.R. § 270.1, by operating a hazardous waste storage facility without a permit or valid exemption to the permitting requirement.

248.    Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), and 40 C.F.R. § 19.4, Defendant is liable for civil penalties in the amount of up to $87,855 per day for operating without a permit in violation of RCRA Subtitle C and its implementing regulations.

249.    Pursuant to Section 605 of the PSWMA, 35 P.S. § 6018.605, Defendant is liable for civil penalties in the amount of up to $25,000 per day for operating without a permit in violation of the PSWMA and its implementing regulations.

**EIGHTH CLAIM FOR RELIEF – RCRA and PSWMA**
**Failure to Comply with Standards for Owners and Operators:**
**Failure to Maintain Adequate Written Job Descriptions**
**25 Pa. Code § 264a.1 & 40 C.F.R. Part 264, Subpart B**

250.    The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

251.    At all relevant times, as the owner and operator of a facility that stores hazardous waste, Defendant was subject to the requirements of 25 Pa. Code § 264a.1 (incorporating by reference 40 C.F.R. Part 264) and 40 C.F.R. Part 264.

252.    Subpart B of 40 C.F.R. Part 264 relates to General Facility Standards. Among other provisions, it requires owners or operators to maintain records at a facility that include a written job description for each position at the facility related to hazardous waste management, 40 C.F.R. § 264.16(d)(2), and documentation of training completed by new hires at the facility, 40 C.F.R. § 264.16(d)(4).

253.    During the 2017 RCRA inspection, Defendant provided Facility personnel records that did not include hazardous waste management responsibilities. Defendant subsequently provided job descriptions for positions with hazardous waste handling responsibilities on September 28, 2017.

254.    From at least August 31, 2017 to September 28, 2017, Defendant violated 25 Pa. Code § 264a.1, which incorporates by reference 40 C.F.R. § 264.16(d)(2), by failing to maintain adequate written job descriptions.

255.    Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), and 40 C.F.R. § 19.4, Defendant is liable for civil penalties in the amount of up to $87,855 per day for each violation of RCRA Subtitle C and its implementing regulations.

256.    Pursuant to Section 605 of the PSWMA, 35 P.S. § 6018.605, Defendant is liable for civil penalties in the amount of up to $25,000 per day for each violation of the PSWMA and its implementing regulations.

**NINTH CLAIM FOR RELIEF – RCRA and PSWMA**
**Failure to Comply with Standards for Owners and Operators:**
**Preparedness and Prevention - Failure to Minimize Risk of Release**
**25 Pa. Code § 264a.1 & 40 C.F.R. Part 264, Subpart C**

257.    The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

258.    Subpart C of 40 C.F.R. Part 264 relates to Preparedness and Prevention. Among other provisions, it requires facilities to be maintained and operated to minimize the possibility of a fire, explosion, or any unplanned or non-sudden release of hazardous waste or hazardous waste constituents to air, soil, or surface water which could threaten human health or the environment. 40 C.F.R. § 264.31.

259.    During the 2018 Multi-Media Inspection, the floor of the 20 Battery Dike had a large amount of material covering the floor, and a strong chemical odor was emanating from within the dike. There was also a hole in the northwestern portion of the dike wall, and a clear-looking liquid entering the dike through this hole.

260.    Material cleaned off the floor of the dike was shipped offsite as hazardous waste, with a hazardous characteristic for ignitability.

261.    Inspection reports of the dike dated April 2-3, April 21, April 23-28, and May 9-10 of 2018 have further documented a liquid entering the dike through a hole in the northwestern wall.

262.    From at least April 3, 2018 until March 31, 2022, Defendant violated 25 Pa. Code § 264a.1(a), which incorporates by reference 40 C.F.R. § 264.31, by failing to minimize the possibility of an unplanned sudden or non-sudden release of hazardous waste or hazardous waste constituents to soil or surface water which could threaten human health or the environment.

263.    Pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), and Section 604 of the PSWMA, 35 P.S. § 6018.604, Defendant is subject to injunctive relief to remedy the violations in this claim.

264.     As the current owner and operator of the Facility, Synthomer is a necessary party under Fed. R. Civ. P. 19(a) and the All Writs Act, 28 U.S.C. § 1651, and is subject to injunctive relief pursuant to Section 3008(a) of RCRA, 42 § 6928(a), to remedy violations in this claim.

265.     Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), and 40 C.F.R. § 19.4, Defendant is liable for civil penalties in the amount of up to $87,855 per day for each violation of RCRA Subtitle C and its implementing regulations.

266.      Pursuant to Section 605 of the PSWMA, 35 P.S. § 6018.605, Defendant is liable for civil penalties in the amount of up to $25,000 per day for each violation of the PSWMA and its implementing regulations.

### TENTH CLAIM FOR RELIEF – RCRA and PSWMA
**Failure to Comply with Standards for Owners and Operators:**
**Failure to Prepare Adequate Contingency Plan**
**25 Pa. Code § 264a.1 & 40 C.F.R. Part 264, Subpart D**

267.     The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

268.     Subpart D of 40 C.F.R. Part 264 relates to Contingency Plan and Emergency Procedures. Among other provisions, it requires facilities to designate a primary emergency coordinator in the contingency plan if more than one person is listed. 40 C.F.R. § 264.52(d).

269.     At the time of the 2017 RCRA Inspection, the EPA inspectors reviewed the Facility's SPCC Plan, dated November 10, 2016, which was also serving as the Facility's Contingency Plan. This Plan did not designate any person as a "Primary Emergency Coordinator" in the emergency contact list.

270.     On September 1, 2017, Defendant provided an updated emergency phone list. While this revised list did include the names of five people who were "Emergency

Coordinators," Defendant still failed to designate an individual as the Primary Emergency Coordinator.

271.    From at least November 10, 2016 to December 15, 2021, Defendant violated 25 Pa. Code § 264a.1(a), which incorporates by reference 40 C.F.R. § 264.52(d), by failing to have a contingency plan that names a primary emergency coordinator.

272.    Pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), and Section 604 of the PSWMA, 35 P.S. § 6018.604, Defendant is subject to injunctive relief to remedy the violations in this claim.

273.    As the current owner and operator of the Facility, Synthomer is a necessary party under Fed. R. Civ. P. 19(a) and the All Writs Act, 28 U.S.C. § 1651, and is subject to injunctive relief pursuant to Section 3008(a) of RCRA, 42 § 6928(a), to remedy violations in this claim.

274.    Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), and 40 C.F.R. § 19.4, Defendant is liable for civil penalties in the amount of up to $87,855 per day for each violation of RCRA Subtitle C and its implementing regulations.

275.     Pursuant to Section 605 of the PSWMA, 35 P.S. § 6018.605, Defendant is liable for civil penalties in the amount of up to $25,000 per day for each violation of the PSWMA and its implementing regulations.

**ELEVENTH CLAIM FOR RELIEF – RCRA and PSWMA**
**Failure to Comply with Standards for Owners and Operators:**
**Failure to Keep Containers Closed**
**25 Pa. Code § 264a.1 & 40 C.F.R. Part 264, Subpart I**

276.    The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

277.    Subpart I of 40 C.F.R. Part 264 relates to Use and Management of Containers. Among other provisions, it requires containers holding hazardous waste to always be closed during storage except when necessary to add or remove waste. 40 C.F.R. § 264.173(a).

278.    At the 2017 RCRA Inspection, EPA determined that Defendant failed to keep three containers of hazardous waste closed at times when it was not adding or removing waste from these containers:

    a.  On a bench in the Shift Lab, there was a 1-gallon container labeled as hazardous waste "D001 Liquid Solvent," without a cap or plug in the opening. The opening was only covered by a metal screen. On September 1, 2017, Defendant provided updated photographs of the container with a cap/plug in place; and

    b.  Beneath the LTC #1 Unit, there was one partially-full 55-gallon container labeled as hazardous waste spent filters and managed by the Facility as a Satellite Accumulation Area. This container had a gap between the container and the lid. On September 1, 2017, Defendant provided updated photographs of the container with a lid secured with a ring seal.

279.    On at least August 30-31, 2017, Defendant violated the requirements of 25 Pa. Code § 264a.1, which incorporates by reference 40 C.F.R. § 264.173(a), by failing to keep three containers of hazardous waste at the Facility closed except when it was necessary to add or remove waste.

280.    Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), and 40 C.F.R. § 19.4, Defendant is liable for civil penalties in the amount of up to $87,855 per day for each violation of RCRA Subtitle C and its implementing regulations.

281.     Pursuant to Section 605 of the PSWMA, 35 P.S. § 6018.605, Defendant is liable for civil penalties in the amount of up to $25,000 per day for each violation of the PSWMA and its implementing regulations.

### TWELFTH CLAIM FOR RELIEF – RCRA and PSWMA
**Failure to Comply with Standards for Owners and Operators: Failure to Provide Adequate Secondary Containment and Conduct Adequate Daily Inspections**
**25 Pa. Code § 264a.1 & 40 C.F.R. Part 264, Subpart J**

282.     The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

283.     Subpart J of 40 C.F.R. Part 264 relates to Tank Systems. Among other provisions, it requires owners or operators to ensure that external liner systems for secondary containment to be free of cracks or gaps, 40 C.F.R. § 264.193(e)(1)(iii), and to conduct daily inspections of tank systems, 40 C.F.R. § 264.195(b).

284.     During the 2017 RCRA Inspection, EPA observed significant gaps in the secondary containment associated with Hazardous Waste Storage Tank #27, between some of the pads of the concrete floor of the 20 Battery Dike. Liquid was visible in one of the gaps. On September 14, 2017, Defendant provided photographs of recently-sealed gaps in the 20 Battery Dike concrete floor.

285.     From at least August 31, 2017 to September 14, 2017, Defendant violated 25 Pa. Code § 264a.1, which incorporates by reference 40 C.F.R. § 264.193(e)(1)(iii), by failing to maintain a secondary containment free of cracks and gaps for Hazardous Waste Storage Tank #27.

286.     During the 2017 RCRA Inspection, liquid was found leaking from the gap created by an unsecured blanking flange at the end of a pipe elbow fitting attached to Hazardous Waste Storage Tank #27. Inspectors identified a long puddle of liquid with a sheen located beneath the

unsecured blanking flange. The size of the puddle indicated that the leak had been occurring for some time. Defendant's inspection records from August 28, 29, and 30, 2017 failed to identify the leak and the resulting liquid puddle.

287.    From at least December 1, 2014 to August 31, 2017, Defendant violated the requirements of 25 Pa. Code § 264a.1, which incorporates by reference 40 C.F.R. § 264.195(b), by failing to conduct adequate daily inspections of Hazardous Waste Storage Tank #27.

288.    During the 2017 RCRA Inspection, EPA determined that Defendant was using the 20,000-gallon Tank 265 to store hazardous waste, which was then shipped offsite. Defendant was not managing this Tank as a hazardous waste storage tank and did not conduct daily inspections of the Tank.

289.    From at least December 1, 2014 through at least August 31, 2017, Defendant violated the requirements of 25 Pa. Code § 264a.1, which incorporates by reference 40 C.F.R. § 264.195(b), by failing to conduct daily inspections of Tank 265.

290.    Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), and 40 C.F.R. § 19.4, Defendant is liable for civil penalties in the amount of up to $87,855 per day for each violation of RCRA Subtitle C and its implementing regulations.

291.    Pursuant to Section 605 of the PSWMA, 35 P.S. § 6018.605, Defendant is liable for civil penalties in the amount of up to $25,000 per day for each violation of the PSWMA and its implementing regulations.

**THIRTEENTH CLAIM FOR RELIEF – RCRA and PSWMA**
**Failure to Comply with Standards for Owners and Operators:**
**Failure Tag Equipment Subject to Air Emission Standards**
**25 Pa. Code § 264a.1 & 40 C.F.R. Part 264, Subpart BB**

292.    The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

293.     Subpart BB of 40 C.F.R. Part 264 relates to Air Emission Standards for Equipment Leaks. Subpart BB applies to equipment at the Facility that contains or contacts hazardous wastes with organic concentrations of at least 10 percent by weight. See 40 C.F.R. § 264.1050(b). Among other provisions, it requires each piece of equipment to be marked to distinguish it from other equipment, 40 C.F.R. § 264.1050(d), valves in light liquid service to be monitored monthly to detect leaks, 40 C.F.R. § 264.1057(a), and flanges to be monitored within 5 days if evidence of a potential leak is found by visual, audible, olfactory, or any other detection method, 40 C.F.R. § 264.1058(a).

294.     During the 2017 RCRA Inspection, EPA identified multiple hazardous waste storage units with ancillary equipment that Defendant had failed to properly mark or identify in Facility records. Each contained or came into contact with hazardous wastes with organic concentrations of at least 10 percent by weight:

      a.  Tags were not present on elbow pipe connectors at or beneath Hazardous Waste Storage Tank #27, which receives hazardous waste from WW Unit's Hazardous Waste Alumina Dryer Drainings Tank (Tank #200-4)

      b.  Tags were not present on flanged connections on piping to and from the MP Poly Unit's Hazardous Waste Alumina Dryer Drainings Tank (Tank #104-3); and

      c.  Tag was not present on unsecured blanking flange at the end of a pipe elbow fitting on a pipe attached to Hazardous Waste Storage Tank #27 at the 20 Battery Dike.

295.     From at least December 1, 2014 through December 16, 2021, Defendant violated 25 Pa. Code § 264a.1, which incorporates by reference 40 C.F.R. § 264.1050(d), by failing to mark pieces of equipment that contained or contacted hazardous wastes with organic

concentrations of at least 10 percent by weight, and that were associated with hazardous waste tanks at the Facility, in such a manner that it could be distinguished readily from other pieces of equipment.

296.    At the 2017 RCRA Inspection, EPA determined that Tank 265 was not managed as a hazardous waste storage tank, was not part of Defendant's LDAR monitoring program, and was not monitored. At the time, Tank 265 was a 20,000-gallon tank used to store hazardous waste with VOC concentrations of at least 10% by weight which was then shipped offsite as hazardous waste (EPA Nos. D001 and D018). A prior inspection on March 31, 2016 identified leaking material around the manway bolts and a valve on Tank 265. Defendant decommissioned Tank 265 in September 2017.

297.    From at least December 1, 2014 through at least August 31, 2017, Defendant violated 25 Pa. Code § 264a.1, which incorporates by reference 40 C.F.R. § 264.1057(a), by failing to conduct monthly monitoring of the valve for Tank 265 to detect leaks.

298.    Pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), and Section 604 of the PSWMA, 35 P.S. § 6018.604, Defendant is subject to injunctive relief to remedy the violations in this claim.

299.    As the current owner and operator of the Facility, Synthomer is a necessary party under Fed. R. Civ. P. 19(a) and the All Writs Act, 28 U.S.C. § 1651, and is subject to injunctive relief pursuant to Section 3008(a) of RCRA, 42 § 6928(a), to remedy violations in this claim.

300.    Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), and 40 C.F.R. § 19.4, Defendant is liable for civil penalties in the amount of up to $87,855 per day for each violation of RCRA Subtitle C and its implementing regulations.

301.     Pursuant to Section 605 of the PSWMA, 35 P.S. § 6018.605, Defendant is liable for civil penalties in the amount of up to $25,000 per day for each violation of the PSWMA and its implementing regulations.

**FOURTEENTH CLAIM FOR RELIEF – RCRA and PSWMA**
**Violation of Generator Requirements: Failure to Make a Hazardous Waste Determination**
**25 Pa. Code § 262a.10 & 40 C.F.R. § 262.11**

302.     The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

303.     As a generator of hazardous waste, Defendant is subject to the requirements of 25 Pa. Code § 262a.10 (incorporating by reference 40 C.F.R. Part 262).

304.     25 Pa. Code § 262a.10, which incorporates by reference 40 C.F.R. § 262.11, provides that a person who generates a solid waste must determine if that waste is a hazardous waste.

305.     At the time of the 2017 RCRA Inspection, Facility personnel were unable to identify the origin of the contents of a partially-full 55-gallon container of waste material located beneath the LTC #2 Unit, or whether the contents consisted of hazardous waste.

306.     On at least August 31, 2017, Defendant violated 25 Pa. Code § 262a.10, which incorporates by reference 40 C.F.R. § 262.11, by failing to make a hazardous waste determination for one partially-full 55-gallon container of waste material as described above.

307.     Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), and 40 C.F.R. § 19.4, Defendant is liable for civil penalties in the amount of up to $87,855 per day for each violation of RCRA Subtitle C and its implementing regulations.

308.      Pursuant to Section 605 of the PSWMA, 35 P.S. § 6018.605, Defendant is liable for civil penalties in the amount of up to $25,000 per day for each violation of the PSWMA and its implementing regulations.

### FIFTEENTH CLAIM FOR RELIEF – RCRA and PSWMA
**Failure to Comply with Universal Waste Management Standards
25 Pa. Code § 266b.1 & 40 C.F.R. § 273.15(a)**

309.      The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

310.      The Facility generates "universal waste" within the meaning of 25 Pa. Code § 266b.1 (incorporating by reference 40 C.F.R. Part 273) and 40 C.F.R. § 273.2, including batteries.

311.      The Facility accumulates less than 5,000 kilograms of universal waste at any time.

312.      At all relevant times, Defendant was a "generator" of universal waste, within the meaning of 25 Pa. Code § 266b.1 (incorporating by reference 40 C.F.R. Part 273) and 40 C.F.R. § 273.2.

313.      At all relevant times, Defendant was a "small quantity handler of universal waste" within the meaning of 25 Pa. Code § 266b.1 (incorporating by reference 40 C.F.R. Part 273) and 40 C.F.R. § 273.2.

314.      As a small quantity handler of universal waste, Defendant is subject to the requirements of 40 C.F.R. Part 273, Subpart B, incorporated by reference into 25 Pa. Code § 266b.1.

315.      Among other provisions, Subpart B requires that a small quantity handler of universal waste may not accumulate universal waste for longer than one year from the date the universal waste is generated, or received from another handler, unless the accumulation is

necessary to facilitate proper recovery, treatment or disposal, and done solely for that purpose. 40 C.F.R. § 273.15(a).

316.    At the time of the 2017 RCRA Inspection, EPA identified a yellow container storing spent lithium batteries, located in the universal waste battery accumulation area of the Lario Building, next to the Facility's maintenance building (the "Yellow Container"). The batteries in this container had been transferred to it from 5-gallon containers of accumulating waste batteries located in the maintenance building.

317.    Defendant identified the start accumulation date for the Yellow Container as July 1, 2016. However, according to Facility personnel, the start accumulation date on the larger containers in the Lario Building, including the Yellow Container, represented the date when the waste batteries were transferred from the smaller containers in the maintenance building, and not the date when the batteries first became a waste.

318.    On September 8, 2017, Defendant provided photographs to EPA demonstrating that the universal waste batteries had been shipped offsite on September 5, 2017.

319.    Therefore, from at least July 1, 2016 until September 5, 2017, Defendant violated 25 Pa. Code § 266b.1(a), which incorporates by reference 40 C.F.R. § 273.15(a), by accumulating universal waste for longer than one year from the date the universal waste is generated.

320.    Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), and 40 C.F.R. § 19.4, Defendant is liable for civil penalties in the amount of up to $87,855 per day for each violation of RCRA Subtitle C and its implementing regulations.

321.     Pursuant to Section 605 of the PSWMA, 35 P.S. § 6018.605, Defendant is liable for civil penalties in the amount of up to $25,000 per day for each violation of the PSWMA and its implementing regulations.

**PRAYER FOR RELIEF**

WHEREFORE, based upon the allegations set forth above, the United States and PADEP request that this Court:

A.     Order such injunctive relief as is necessary to compel Defendant and Synthomer to bring the Facility into, and thereafter maintain, compliance with the CWA, the CAA, RCRA, the PCSL, the PSWMA and their implementing regulations;

B.     Assess a civil penalty against Defendant for each day of each separate violation of the CWA, the CAA, RCRA, the PCSL and the PSWMA and their implementing regulations;

C.     Award the Plaintiffs their costs of this action; and

D.     Grant such other relief as the Court deems appropriate.

Respectfully submitted,


FOR THE UNITED STATES:

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice


Dated: March 23, 2023          */s/Stacy D. Coleman*          
STACY D. COLEMAN (DC 994961)
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
999 18th Street
Suite 370, South Terrace
Denver, Colorado 80205
T: 303-844-7240
F: 303-844-1350
Stacy.Coleman@usdoj.gov


TROY RIVETTI
Acting United States Attorney
Western District of Pennsylvania


*/s/Paul Skirtich*          
PAUL SKIRTICH (PA 30440)
Assistant United States Attorney
Western District of Pennsylvania
United States Attorney's Office
Joseph F. Weis, Jr. U.S. Courthouse
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
T: 412-894-7418
F: 412-644-6995
Paul.Skirtich@usa.doj.gov

FOR THE COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF
ENVIRONMENTAL PROTECTION:


Date ___3/20/2023_____          *James E. Miller*
                                     JAMES E. MILLER
                                     Regional Director
                                     Southwest Regional Office
                                     Pa Department of Environmental Protection
                                     400 Waterfront Drive
                                     Pittsburgh, PA 15222-4745



                                     MELANIE B. SEIGEL
                                     Assistant Counsel
                                     Office of Chief Counsel
                                     Pa Department of Environmental Protection
                                     400 Waterfront Drive
                                     Pittsburgh, PA 15222-4745